## UNITED STATES DISTRICT COURT
### FOR THE
### MIDDLE DISTRICT OF NORTH CAROLINA
### GREENSBORO DIVISION
Case No. 1:20-CV-216

| | |
|---|---|
| DAVID P. DOBY and JOHN E. DOBY, as Co-Administrators of the Estate of WILLIAM P. DOBY,<br><br>Plaintiffs,<br><br>v.<br><br>GLAXOSMITHKLINE, LLC; GLAXOSMITHKLINE, PLC; GLENMARK PHARMACEUTICALS, LTD.; GLENMARK GENERICS, LTD.; GLENMARK GENERICS, INC., USA; GLENMARK PHARMACEUTICALS INC., USA, and DOES 1 through 100 inclusive. | **COMPLAINT**<br>**(Jury Trial Demanded)** |

**NOW COME** Plaintiffs, by and through the undersigned counsel, complaining of Defendants, and allege as follow. Plaintiffs' allegations are based on investigations of counsel and are thus alleged on information and belief except as to Plaintiffs' own actions, of which they have direct personal knowledge.

## INTRODUCTION

1.     N-Nitrosodimethylamine ("NDMA") is a potent carcinogen. It used to be a chemical byproduct from the making of rocket fuel in the early 1900s, but today its only use is to induce tumors in animals as part of laboratory experiments. Its only function is to cause cancer. It has no business being in a human body.

1

2.     Zantac (chemically known as ranitidine), the popular antacid medication used by millions of people every day, leads to the production of staggering amounts of NDMA when it is digested by the human body. The U.S. Food and Drug Administration's ("FDA") allowable daily limit of NDMA is 92 nanograms ("ng") and yet researchers are discovering more than 3,000,000 ng in a single dose of Zantac.

3.     These recent revelations by independent researchers have caused widespread recalls of Zantac both domestically and internationally, and the FDA is actively investigating the issue, with is preliminary results showing "unacceptable" levels of NDMA.

4.     To be clear, this is not a contamination case—the levels of NDMA that researchers are seeing in Zantac are not the product of some manufacturing error. Rather, the high levels of NDMA observed in Zantac are a function of the ranitidine molecule and the way it breaks down in the human digestive system.

5.     Decedent took ranitidine for approximately nine years and, as a result, developed colon cancer, which was first diagnosed in or around November 2017. His cancer was caused by NDMA exposure created by the ingestion of ranitidine.

6.     This lawsuit seeks damages against the Defendants for causing Decedent's cancer and ultimately his death on March 10, 2018.

**PARTIES**

7.     Plaintiffs, David P. Doby and John E. Doby, are natural-born sons of William P. Doby ("Decedent").

8.     Plaintiffs are co-Administrators of Decedent's estate, having been duly appointed by the Clerk of Superior Court of Orange County, North Carolina. They are acting as Administrators in the institution of the action pursuant to Sections 28A-18-1 and 28A-18-2 of the North Carolina General Statutes.

9.     Plaintiff David P. Doby is a resident of Orange County, in this judicial district.

10.     Plaintiff John E. Doby is a resident of Alamance County, in this judicial district.

11.     Decedent was a resident of Orange County, in this judicial District, before his death.

12.     Defendant GlaxoSmithKline PLC ("GSK PLC") is an English corporation with its global headquarters and principal place of business at 980 Great West Road, Brentford, Middlesex, England. Defendant GlaxoSmithKline PLC is the successor-in-interest to the companies that initially developed, patented, and commercialized the molecule known as ranitidine in the 1970s. In 1983, Glaxo Holdings, Ltd., now part of GlaxoSmithKline PLC, was awarded approval by the FDA to sell Zantac in the United States.

13.     Defendant GlaxoSmithKline, LLC ("GSK LLC" or, collectively with GSK PLC, "GSK" or "GSK Defendants") is a Delaware limited-liability company with its principal place of business located both at 5 Crescent Drive, Philadelphia, Pennsylvania, 19112, and Five Moore Drive, Durham, North Carolina, 27709. Defendant GSK LLC's registered agent is located at 251 Little Falls Drive, Wilmington, Delaware 19808.

Case 1:20-cv-00216-UA-JLW   Document 1   Filed 03/06/20   Page 3 of 51

14.     GSK was the original innovator of the Zantac drug and controlled the NDA for prescription Zantac between 1983 and 2009. By controlling the Zantac NDA it also directly controlled the labeling for all Zantac products through 2009. And the GSK Defendants' negligence and misconduct related to Zantac as an innovator directly led to the failure to warn for generic and other OTC versions of Zantac.

15.     Defendant Glenmark Pharmaceuticals Ltd. is an Indian corporation with its headquarters and a principal place of business at Glenmark House, HDO-Corporate building, Wing -A, B D SawantMarg, Chakala, Off Western Express Highway, Mumbai 400099, Maharashtra, India. Defendant Glenmark Pharmaceuticals Ltd. purposefully availed itself of the privilege of conducting business in the state of North Carolina by selling its pharmaceutical products to distributors and pharmacies in the state, with the intent that the products would be used and consumed my North Carolina residents.

16.     Defendant Glenmark Generics Ltd. is an Indian corporation with its headquarters and a principal place of business at Glenmark House, HDO-Corporate building, Wing -A, B D Sawant Marg, Chakala, Off Western Express Highway, Mumbai 400099, Maharashtra, India. Glenmark Generics Ltd. is a wholly owned subsidiary of Glenmark Pharmaceuticals Ltd. Defendant Glenmark Pharmaceuticals Ltd. purposefully availed itself of the privilege of conducting business in the state of North Carolina by selling its pharmaceutical products to distributors and pharmacies in the state, with the intent that the products would be used and consumed my North Carolina residents.

17.     Defendant Glenmark Generics, Inc. USA is a Delaware corporation with a principal place of business at 750 Corporate Drive, Mahwah, New Jersey, 07430.

Glenmark Generics, Inc. USA is a wholly owned subsidiary of Glenmark Pharmaceuticals Ltd. and the North American Division of Glenmark Generics Ltd. Defendant Glenmark Generics, Inc. USA purposefully availed itself of the privilege of conducting business in the state of North Carolina by selling its pharmaceutical products to distributors and pharmacies in the state, with the intent that the products would be used and consumed by North Carolina residents.

18.     Defendant Glenmark Pharmaceuticals Inc., USA, is a Delaware corporation with a principal place of business at 750 Corporate Drive, Mahwah, New Jersey, 07430. Glenmark Pharmaceuticals Inc., USA, is a wholly owned subsidiary of Glenmark Pharmaceuticals Ltd. Its registered agent is located at 251 Little Falls Drive, Wilmington, Delaware 19808. Defendant Glenmark Pharmaceuticals Inc., USA, purposefully availed itself of the privilege of conducting business in the state of North Carolina by selling its pharmaceutical products to distributors and pharmacies in the state, with the intent that the products would be used and consumed by North Carolina residents.

19.     Defendants Glenmark Pharmaceuticals Ltd., Glenmark Generics Ltd., Glenmark Generics, Inc. USA, and Glenmark Pharmaceuticals Inc., USA (collectively "Glenmark" or "Glenmark Defendants") manufactured and sold prescription ranitidine in the United States after November 2008.

20.     Plaintiffs presently lack information sufficient to specifically identify the true names or capacities, whether individual, corporate, or otherwise, of the Defendants sued herein under the fictitious names DOES 1 through 100 inclusive. Plaintiffs will amend this Complaint to show their true names and capacities if and when they are

ascertained. Plaintiffs are informed and believe, and on such information and belief allege, that each Defendants named as a DOE is responsible in some manner for the events and occurrences alleged in this Complaint and is liable for the relief sought herein.

## JURISDICTION AND VENUE

21.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1332, because there is complete diversity of citizenship between the Plaintiffs and the Defendants, and because Plaintiffs seek damages in excess of $75,000, exclusive of interest and costs.

22.     This Court has personal jurisdiction over each Defendant insofar as each Defendant is authorized and licensed to conduct business in the State of North Carolina maintains and carries on systematic and continuous contacts in this judicial district, regularly transacts business within this judicial district, and regularly avails itself of the benefits of this judicial district.

23.     Additionally, the Defendants caused tortious injury by acts and omissions in this judicial district and caused tortious injury in this district by acts and omissions outside this district while regularly doing and soliciting business, engaging in a persistent course of conduct, and deriving substantial revenue from goods used or consumed and services rendered in this judicial district.

24.     Venue is proper before this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this claim occurred within this judicial district.

Case 1:20-cv-00216-UA-JLW   Document 1   Filed 03/06/20   Page 6 of 51

## FACTUAL ALLEGATIONS

**Brief history of Zantac and Ranitidine**

25.     Zantac was developed by GlaxoSmithKline ("GSK") and approved for prescription use by the FDA in 1983. The drug belongs to a class of medications called histamine $H_2$-receptor antagonists (or $H_2$ blockers) that decrease the amount of acid produced by the stomach and are used to treat gastric ulcers, heartburn, acid indigestion, sour stomach, and other gastrointestinal conditions.

26.     Due in large part to GSK's marketing strategy, Zantac was a wildly successful drug, reaching $1 billion in total sales in December 1986. As one 1996 article put it, Zantac became "the best-selling drug in history as a result of a shrewd, multifaceted marketing strategy that . . . enabled the product to dominate the acid/peptic marketplace."[1] Significantly, the marketing strategy that led to Zantac's success emphasized the drug's purported safety.

27.     Zantac became available without a prescription in 1996, and generic versions of the drug (ranitidine) became available the following year.

28.     One of those manufacturers who entered the market to sell prescription ranitidine in the United States was Glenmark Generics, Inc. USA. In or around November 2008, Glenmark Generics, Inc. USA received FDA approval to manufacture, market and sell generic ranitidine.[2]

---

[1] Wright, R., *How Zantac Became the Best-Selling Drug in History*, 1 J. HEALTHCARE MKTG. 4, 24 (Winter 1996).
[2] Ghangurde, Anju, "Glenmark receives FDA ok for ranitidine," (Nov. 24, 2009),

Case 1:20-cv-00216-UA-JLW   Document 1   Filed 03/06/20   Page 7 of 51

29.     Although sales of brand-name Zantac declined as a result of generic and alternative products, Zantac sales have remained strong over time. As recently as 2018, Zantac was one of the top 10 antacid tablet brands in the United States, with sales of Zantac 150 totaling $128.9 million—a 3.1% increase from the previous year.

30.     On September 13, 2019, in response to a citizen's petition filed by Valisure, Inc. (discussed in detail below), U.S. and European regulators stated that they are reviewing ranitidine's safety.

31.     On September 18, 2019, Novartis AG's Sandoz Unit, which makes generic drugs, stated that it was halting the distribution of its versions of Zantac in all markets while Canada requested drug makers selling ranitidine to stop distribution.

32.     On or around September 26, 2019, Walgreens stopped selling ranitidine products, including the prescription generic ranitidine manufactured and sold by the Glenmark Defendants.

33.     On or around September 28, 2019, CVS Health Corp. stated that it would stop selling Zantac and its own generic ranitidine products out of concern that it might contain a carcinogen. Walmart, Inc., Walgreens Boot Alliance, and Rite Aid Corp. then also removed Zantac and ranitidine products.

34.     On October 2, 2019, the FDA stated that it was ordering all manufacturers of Zantac and ranitidine products to conduct testing for NDMA and that preliminary results indicated unacceptable levels of NDMA so far.

---

https://medtech.pharmaintelligence.informa.com/SC032085/Glenmark-receives-FDA-ok-forranitidine (last visited 2/28/20).

35.     On December 17, 2019, Glenmark Pharmaceutical Inc., USA, announced a recall of all lots of 150- and 300-mg ranitidine tablets with expiration dates between December 2019 and May 2022.

36.     Before that series of disclosures, no Defendant at any time attempted to include a warning about NDMA or any cancer, nor did the FDA ever reject such a warning. Defendants had the ability to unilaterally add an NDMA and/or cancer warning to the Zantac label (for both prescription and OTC) without prior FDA approval pursuant to the Changes Being Effected regulation. Had any Defendant attempted to add an NDMA warning to the Zantac label (either for prescription or OTC), the FDA would not have rejected it.

**Dangers of NDMA**

37.     NDMA is a semi-volatile organic chemical that forms in both industrial and natural processes. It is a member of N-nitrosamines, a family of potent carcinogens. The dangers that NDMA poses to human health have long been recognized. A news article published in 1979 noted that "NDMA has caused cancer in nearly every laboratory animal tested so far."[3] NDMA is no longer produced or commercially used in the United

---

[3] Jane Brody, *Bottoms Up: Alcohol in moderation can extend life*, THE GLOBE AND MAIL (Canada) (Oct. 11, 1979); *see* Rudy Platiel, *Anger grows as officials unable to trace poison in reserve's water*, THE GLOBE AND MAIL (Canada) (Jan. 6, 1990) (reporting that residents of Six Nations Indian Reserve "have been advised not to drink, cook or wash in the water because testing has found high levels of N-nitrosodimethylamine (NDMA), an industrial byproduct chemical that has been linked to cancer"); Kyrtopoulos et al, *DNA adducts in humans after exposure to methylating agents*, 405 MUTATIONS RSCH. 135 (1998) (noting that "chronic exposure of rats to very low doses of NDMA gives rise predominantly to liver tumours, including tumors of the liver cells (hepatocellular carcinomas), bile ducts, blood vessels and Kupffer cells").

States, except for research, such as a tumor initiator in certain animal bioassays. In other words, it is only a poison.

38.     Both the Environmental Protection Agency ("EPA") and the International Agency for Research on Cancer ("IARC") have classified NDMA as a probable human carcinogen. And the World Health Organization ("WHO") has stated that scientific testing indicates that NDMA consumption is positively associated with either gastric or colorectal cancer and suggests that humans may be especially sensitive to the carcinogenicity of NDMA.

39.     As early as 1980, consumer products containing unsafe levels of NDMA and other nitrosamines have been recalled by manufacturers, either voluntarily or at the direction of the FDA.

40.     Most recently, beginning in the summer of 2018, several generic drugs used to treat high blood-pressure and heart failure—valsartan, losartan, and irbesartan— have been recalled because the medications contained nitrosamine impurities that do not meet the FDA's safety standards. The FDA has established a permissible daily intake limit for the probable human carcinogen NDMA of 96 ng. However, the highest level of NDMA detected by the FDA in any of the Valsartan tablets was 20.19 μg (20,190 ng) per tablet. In the case of Valsartan, the NDMA was an impurity caused by a manufacturing defect, and thus NDMA was present in only some products containing valsartan. Zantac poses a greater safety risk than any of the recently recalled valsartan tablets. Not only is NDMA a byproduct of the ranitidine molecule itself, but the levels observed in recent testing show NDMA levels in excess of 3,000,000 ng.

10

41.     Tobacco smoke also contains NDMA. One filtered cigarette contains between five and forth-three ng of NDMA.

42.     In mouse studies examining the carcinogenicity of NDMA through oral administration, animals exposed to NDMA developed cancer in the kidney, bladder, liver, and lung. In comparable rat studies, similar cancers were observed in the liver, kidney, pancreas, and lung. In comparable hamster studies, similar cancers were observed in the liver, pancreas, and stomach. In comparable Guinea-pig studies, similar cancers were observed in the liver and lung. In comparable rabbit studies, similar cancers were observed in the liver and lung.

43.     In other long-term animal studies of mice and rats utilizing different routes of exposures—inhalation, subcutaneous injection, and intraperitoneal (abdomen injection)—cancer was observed in the lung, liver, kidney, nasal cavity, and stomach.

44.     Alarmingly, Zantac is in the FDA's category B for birth defects, meaning it is considered safe to take during pregnancy. However, in animal experiments, for those animals exposed to NDMA during pregnancy, the offspring had elevated rates of cancer in the liver and kidneys.

45.     In addition, NDMA breaks down into various derivative molecules that, themselves, are associated with causing cancer. In animal studies, derivatives of NDMA induced cancer in the stomach and intestines.

46.     Medical research shows that doses of NDMA above 40 ng enter the body's general circulation.

Case 1:20-cv-00216-UA-JLW   Document 1   Filed 03/06/20   Page 11 of 51

47.     Numerous *in vitro* studies confirm that NDMA is a mutagen—causing mutations in human and animal cells.

48.     Overall, testing on animals demonstrates that NDMA is carcinogenic in all animal species tested: mice; rats; Syrian golden, Chinese, and European hamsters; guinea-pigs; rabbits; ducks; mastomys; fish; newts; and frogs.

49.     Pursuant to the EPA's cancer guidelines, "tumors observed in animals are generally assumed to indicate that an agent may produce tumors in humans."

50.     In addition to the overwhelming animal data linking NDMA to cancer, there are numerous human epidemiological studies exploring the effects of dietary exposure to various cancers. And, while these studies (several discussed below) consistently show increased risks of various cancers, the exposure levels considered in these studies are a very small fraction—as little as 1 millionth—the exposures noted in a single Zantac capsule, *i.e.*, 0.191 ng/day (dietary) compared to 304,500 ng/day (Zantac).

51.     In a 1995 epidemiological case-control study looking at NDMA dietary exposure with 220 cases, researchers observed a statistically significant 700% increased risk of gastric cancer in persons exposed to more than 0.51 ng/day of NDMA.[4]

52.     In a 1995 epidemiological case-control study looking at NDMA dietary exposure with 746 cases, researchers observed statistically significant elevated rates of gastric cancer in persons exposed to more than 0.191 ng/day.[5]

---

[4] Pobel et al, *Nitrosamine, nitrate and nitrite in relation to gastric cancer: a case-control study in Marseille, France*, 11 EUR. J. EPIDEMIOLOGY. 67–73 (1995).
[5] La Vecchia et al, *Nitrosamine Intake and Gastric Cancer Risk*, 4 EUR. J. CANCER PREVENTION. 469– 74 (1995).

53. In another 1995 epidemiological case-control study looking at, in part, the effects of dietary consumption on cancer, researchers observed a statistically significant elevated risk of developing aerodigestive cancer after being exposed to NDMA at 0.179 ng/day.[6]

54. In a 1999 epidemiological cohort study looking at NDMA dietary exposure with 189 cases and a follow up of 24 years, researchers noted that "N-nitroso compounds are potent carcinogens" and that dietary exposure to NDMA more than doubled the risk of developing colorectal cancer.[7]

55. In a 2000 epidemiological cohort study looking at occupational exposure of workers in the rubber industry, researchers observed significant increased risks for NDMA exposure for esophagus, oral cavity, pharynx, prostate, and brain cancer.[8]

56. In a 2011 epidemiological cohort study looking at NDMA dietary exposure with 3,268 cases and a follow up of 11.4 years, researchers concluded that "[d]ietary NDMA intake was significantly associated with increased cancer risk in men and women" for all cancers, and that "NDMA was associated with increased risk of gastrointestinal cancers" including rectal cancers.[9]

---

[6] Rogers et al, *Consumption of Nitrate, Nitrite, and Nitrosodimethylamine and the Risk of Upper Aerodigestive Tract Cancer*, 5 CANCER EPIDEMIOLOGY, BIOMARKERS & PREVENTION. 29–36 (1995).

[7] Knekt et al, *Risk of Colorectal and Other Gastro-Intestinal Cancers after Exposure to Nitrate, Nitrite and N-Nitroso Compounds: A Follow-Up Study*, 80 INT'L J. CANCER 852–56 (1999).

[8] Straif et al, *Exposure to high concentrations of nitrosamines and cancer mortality among a cohort of rubber workers,* 57 Occupational Env. Medicine 180–87 (2000).

[9] Loh et al, *N-nitroso compounds and cancer incidence: the European Prospective Investigation into Cancer and Nutrition (EPIC)–Norfolk Study*, 93 AM. J. CLINICAL NUTRITION. 1053–61 (2011).

57.     In a 2014 epidemiological case-control study looking at NDMA dietary exposure with 2,481 cases, researchers found a statistically significant elevated association between NDMA exposure and colorectal cancer.[10]

**How Ranitidine Transforms into NDMA Within the Body**

58.     The high levels of NDMA produced by Zantac are not caused by a manufacturing defect but are inherent to the molecular structure of ranitidine, the active ingredient in Zantac. The ranitidine molecule contains both a nitrite and a dimethylamine ('DMA') group which are well known to combine to form NDMA. Thus, ranitidine produces NDMA by "react[ing] with itself", which means that every dosage and form of ranitidine, including Zantac, exposes users to NDMA.

59.     The formation of NDMA by the reaction of DMA and a nitroso source (such as a nitrite) is well characterized in the scientific literature and has been identified as a concern for contamination of the American water supply.[11] Indeed, in 2003, alarming levels of NDMA in drinking water processed by wastewater treatment plants was specifically linked to the presence of ranitidine.[12]

60.     The ranitidine molecule's instability was further elucidated in scientific studies investigating ranitidine as a source of NDMA in drinking water and specific mechanisms for the breakdown of ranitidine were proposed, as shown in Figure 2

---

[10] Zhu et al, *Dietary N-nitroso compounds and risk of colorectal cancer: a case-control study in Newfoundland and Labrador and Ontario, Canada*, 111 BR. J. NUTR. 6, 1109–17 (2014).
[11] Ogawa et al, *Purification and properties of a new enzyme, NG, NG-dimethylarginine dimethylaminohydrolase, from rat kidney*, 264 J. BIOL. CHEM. 17, 10205–09 (1989).
[12] Mitch et al, *N-Nitrosodimethylamine (NDMA) as a Drinking Water Contaminant: A Review*, 20 ENVTL. ENG'G SCI. 5, 389–404 (2003).

above.[13] These studies underscore the instability of the NDMA group on the ranitidine molecule and its ability to form NDMA in the environment of water treatment plants which supply many American cities with water.

61.     These studies did not appreciate the full extent of NDMA formation risk from ranitidine; specifically, the added danger of this drug having not only a labile, or easily broken down, DMA group but also a readily available nitroso source in its nitrite group on the molecule's opposite terminus. Recent testing of NDMA levels in ranitidine batches are so high that the nitroso for NDMA probably comes from no source other than the ranitidine molecule itself.

62.     Valisure, LLC is an online pharmacy that also runs an analytical laboratory that is ISO 17025 accredited by the International Organization for Standardization ("ISO") – an accreditation recognizing the laboratory's technical competence for regulatory purposes. Valisure's mission is to help ensure the safety, quality, and consistency of medications and supplements in the market. In response to rising concerns about counterfeit medications, generics, and overseas manufacturing, Valisure developed proprietary analytical technologies that it uses in addition to FDA standard assays to test every batch of every medication it dispenses.

63.     As part of its testing of Zantac, and other ranitidine products, in every lot tested, Valisure discovered exceedingly high levels of NDMA. Valisure's ISO 17025 accredited laboratory used FDA recommended GC/MS headspace analysis method

---

[13] Le Roux et al, *NDMA Formation by Chloramination of Ranitidine: Kinetics and Mechanism*, 46 ENVTL. SCI. & TECH. 20, 11095–11103 (2012).

15

FY19-005-DPA8 for the determination of NDMA levels. As per the FDA protocol, this method was validated to a lower limit of detection of 25 ng.[14] The results of Valisure's testing show levels of NDMA well above 2,000,000 ng per 150 mg Zantac tablet, shown below in Table 1.

_____

[14] U.S. Food & Drug Admin.. (updated 01/25/2019). Combined N-Nitrosodimethlyamine (NDMA) and N-Nitrosodiethylamine (NDEA) Impurity Assay, *FY19-005-DPA-S*.

| Table 1. Ranitidine Samples Tested by Valisure Laboratory Using GC/MS Protocol | | |
|---|---|---|
| **150 mg Tablets or equivalent** | **Lot #** | **NDMA per tablet (ng)** |
| Reference Powder* | 125619 | 2,472,531 |
| Zantac, Brand OTC | 18M498M | 2,511,469 |
| Zantac (mint), Brand OTC | 18H546 | 2,834,798 |
| Wal-Zan, Walgreens | 79L800819A | 2,444,046 |
| Wal-Zan (mint), Walgreens | 8ME2640 | 2,635,006 |
| Ranitidine, CVS | 9BE2773 | 2,520,311 |
| Zantac (mint), CVS | 9AE2864 | 3,267,968 |
| Ranitidine, Equate | 9BE2772 | 2,479,872 |
| Ranitidine (mint), Equate | 8ME2642 | 2,805,259 |
| Ranitidine, Strides | 77024060A | 2,951,649 |

64.     Valisure's testing shows, on average, 2,692,291 ng of NDMA in a 150 mg Zantac tablet. Considering the FDA's permissible limit is 96 ng, this would put the level of NDMA at **28,000 times** the legal limit. In terms of smoking, a person would need to smoke at least 6,200 cigarettes to achieve the same levels of NDMA found in one 150 mg dose of Zantac.

65.     Valisure, however, was concerned that the extremely high levels of NDMA observed in its testing were a product of the modest oven heating parameter of 130° C in the FDA-recommended GC/MS protocol. Valisure therefore developed a low-temperature GC/MS method that could still detect NDMA but would only subject

Case 1:20-cv-00216-UA-JLW   Document 1   Filed 03/06/20   Page 17 of 51

samples to 37° C, the average temperature of the human body. This method was validated to a lower limit of detection of 100 ng.

66.     Valisure tested ranitidine tablets by themselves and in conditions simulating the human stomach. Industry standard "Simulated Gastric Fluid" ("SGF" 50 mM potassium chloride, 85 mM hydrochloric acid adjusted to pH 1.2 with 1.25 g pepsin per liter) and "Simulated Intestinal Fluid" ("SIF") 50 mM potassium chloride, 50 mM potassium phosphate monobasic adjusted to pH 6.8 with hydrochloric acid and sodium hydroxide) were used alone and in combination with various concentrations of nitrite, which is commonly ingested in foods like processed meats and is elevated in the stomach by antacid drugs.

67.     Indeed, Zantac was specifically advertised to be used when consuming foods containing high levels of nitrates, like tacos, pizza, et cetera.[15]

68.     The results of Valisure's tests on ranitidine tablets in biologically relevant conditions demonstrate significant NDMA formation under simulated gastric conditions with nitrite present (*see* Table 2 below).

---

[15] *See, e.g.,* https://www.ispot.tv/ad/dY7n/zantac-family-taco-night; https://youtu.be/jzS2kuB5_wg; https://youtu.be/Z3QMwkSUlEg; https://youtu.be/qvh9gyWqQns.

Case 1:20-cv-00216-UA-JLW   Document 1   Filed 03/06/20   Page 18 of 51

| Table 2. Valisure Biologically relevant tests for NDMA formation | | |
|---|---|---|
| **Ranitidine Tablet Studies** | **NDMA (ng/mL)** | **NDMA per tablet (ng)** |
| Tablet without solvent | Not detected | Not detected |
| Tablet | Not detected | Not detected |
| Simulated Gastric Fluid ("SGF") | Not detected | Not detected |
| Simulated Intestinal Fluid | Not detected | Not detected |
| SGF with 10 mM sodium nitrite | Not detected | Not detected |
| SGF with 25 mM sodium nitrite | 236 | 23,600 |
| SGF with 50 mM sodium nitrite | 3,045 | 304.500 |

69.     Under biologically relevant conditions, when nitrites are present, staggeringly high levels of NDMA are found in one dose of 150 mg Zantac, ranging between 245 and 3,100 times above the FDA-allowable limit. In terms of smoking, one would need to smoke more than 500 cigarettes to achieve the same levels of NDMA found in one dose of 150 mg Zantac at the 25 ng level (over 7,000 for the 50 μg level).

70.     Antacid drugs are known to increase stomach pH and thereby increase the growth of nitrite-reducing bacteria which further elevate levels of nitrite. This fact is well known and even present in the warning labels of antacids like Prevacid (lansoprazole) and was specifically studied with ranitidine in the original approval of the drug. Thus, higher levels of nitrites in patients regularly taking Zantac would be expected.

71.     In fact, NDMA formation in the stomach has been a concern for many years, and ranitidine has been specifically implicated as a cause of NDMA formation by multiple research groups, including those at Stanford University.

72.     Existing research shows that ranitidine interacts with nitrites and acids in the chemical environment of the human stomach to form NDMA. *In vitro* tests

19

demonstrate that when ranitidine undergoes "nitrosation" (the process of a compound being converted into nitroso derivatives) by interacting with gastric fluids in the human stomach, the by-product created is dimethylamine ("DMA") – which is an amine present in ranitidine itself. When DMA is released, it can be nitrosated even further to form NDMA, a secondary N-nitrosamine.

73.     Moreover, in addition to the gastric fluid mechanisms investigated in the scientific literature, Valisure identified a possible enzymatic mechanism for the liberation of ranitidine's DMA group via the human enzyme dimethylarginine dimethylaminohydrolase ("DDAH") which can occur in other tissues and organs separate from the stomach.

74.     Liberated DMA can lead to the formation of NDMA when exposed to nitrite present on the ranitidine molecule, nitrite freely circulating in the body, or other potential pathways, particularly in weak acidic conditions such as that in the kidney or bladder. The original scientific paper detailing the discovery of the DDAH enzyme in 1989 specifically comments on the propensity of DMA to form NDMA: "This report also provides a useful knowledge for an understanding of the endogenous source of dimethylamine as a precursor of a potent carcinogen, dimethylnitrosamine [NDMA]."[16]

75.     Computational modelling demonstrates that ranitidine can readily bind to the DDAH-1 enzyme in a manner similar to the natural substrate of DDAH-1 known as asymmetric dimethylarginine.

---

[16] Ogawa et al, *Purification and properties of a new enzyme, NG, NG-dimethylarginine dimethylaminohydrolase, from rat kidney*, 264 J. Bio. Chem. 17, 10205–09 (1989)

76.    These results indicate that the enzyme DDAH-1 increases formation of NDMA in the human body when ranitidine is present; therefore, the expression of the DDAH-1 gene is useful for identifying organs most susceptible to this action.

77.    DDAH-1 is most strongly expressed in the kidneys but also broadly distributed throughout the body, such as in the liver, prostate, stomach, bladder, brain, colon, and prostate. This offers both a general mechanism for NDMA formation in the human body from ranitidine and specifically raises concern for the effects of NDMA on numerous organs, including the bladder.

78.    In addition to the aforementioned *in vitro* studies that suggest a strong connection between ranitidine and NDMA formation, *in vivo* clinical studies in living animals add further weight to concern over this action and overall potential carcinogenicity. A study published in the journal *Carcinogenesis* in 1983 titled "Genotoxic effects in rodents given high oral doses of ranitidine and sodium nitrite" specifically suspected the carcinogenic nature of ranitidine in combination with nitrite. The authors of this study concluded: "Our experimental findings have shown that simultaneous oral administration in rats of high doses of ranitidine and $NaNO_2$ [nitrite] can produce DNA fragmentation either in liver or in gastric mucosa."[17]

79.    The human data, although limited at this point, is even more concerning. A study completed and published in 2016 by Stanford University observed that healthy individuals, both male and female, who ingested Zantac 150 mg tablets produced roughly

---

[17] Brambilla et al., *Genotoxic effects in rodents given high oral doses of ranitidine and sodium nitrite*, 4 CARCINOGENESIS 10, 1281–85 (1983).

Case 1:20-cv-00216-UA-JLW   Document 1   Filed 03/06/20   Page 21 of 51

400 times elevated amounts of NDMA in their urine (over 47,000 ng) in the proceeding 24 hours after ingestion.[18]

80. Presumably due to the perceived high safety profile of ranitidine, very few epidemiological studies have been conducted on this drug.

81. A 2004 study published by the National Cancer Institute investigated 414 cases of peptic ulcer disease reported in 1986 and followed the individual cases for 14 years.[19] One of the variables investigated by the authors was the patients' consumption of a prescription antacid, either Tagamet (cimetidine) or Zantac (ranitidine). The authors concluded that "[r]ecent use of ulcer treatment medication (Tagamet and Zantac) was also related to the risk of bladder cancer, and this association was independent of the elevated risk observed with gastric ulcers." Specifically, the authors note that "N-Nitrosamines are known carcinogens, and nitrate ingestion has been related to bladder cancer risk." NDMA is among the most common of the NNitrosamines.

82. A 1982 clinical study in rats compared ranitidine and cimetidine exposure in combination with nitrite. When investigating DNA fragmentation in the rats' livers, no effect was observed for cimetidine administered with nitrite, but ranitidine administered with nitrite resulted in a significant DNA fragmentation.[20]

---

[18] Zeng et al, *Oral intake of ranitidine increases urinary excretion of N-nitrosodimethylamine*, 37 CARCINOGENESIS 625–34 (2016).

[19] Michaud et al, *Peptic ulcer disease and the risk of bladder cancer in a prospective study of male health professionals*, 13 CANCER EPIDEMIOLOGY, BIOMARKERS & PREVENTION. 2, 250–54 (2004).

[20] Brambilla et al, *Genotoxic Effects of Drugs: Experimental Findings Concerning Some Chemical Families of Therapeutic Relevance*, Nicolini C. (ed.) Chemical Carcinogenesis. NATO Advanced Study Institutes Series (Series A: Life Sciences), Vol. 52. Springer, Boston, MA (1982).

Case 1:20-cv-00216-UA-JLW   Document 1   Filed 03/06/20   Page 22 of 51

83. Investigators at Memorial Sloan Kettering Cancer Center are actively studying ranitidine to evaluate the extent of the public health implications of these findings. Regarding ranitidine, one of the investigators commented: "A potential link between NDMA and ranitidine is concerning, particularly considering the widespread use of this medication. Given the known carcinogenic potential of NDMA, this finding may have significant public health implications[.]"

**Defendants Knew of the NDMA Defect but Failed to Warn or Test**

84. During the time that Defendants manufactured and sold Zantac in the United States, the weight of scientific evidence showed that Zantac exposed users to unsafe levels of NDMA. Defendants failed to disclose this risk to consumers on the drug's label—or through any other means—and Defendants failed to report these risks to the FDA.

85. Going back as far as 1981, two years before Zantac entered the market, research showed elevated rates of NDMA, when properly tested. This was known or should have been known by Defendants.

86. Defendants concealed the Zantac–NDMA link from consumers in part by not reporting it to the FDA, which relies on drug manufacturers (or others, such as those who submit citizen petitions) to bring new information about an approved drug like Zantac to the agency's attention.

87. Manufacturers of an approved drug are required by regulation to submit an annual report to the FDA containing, among other things, new information regarding the drug's safety pursuant to 21 C.F.R. § 314.81(b)(2):

Case 1:20-cv-00216-UA-JLW   Document 1   Filed 03/06/20   Page 23 of 51

The report is required to contain . . . [a] brief summary of significant new information from the previous year that might affect the safety, effectiveness, or labeling of the drug product. The report is also required to contain a brief description of actions the applicant has taken or intends to take as a result of this new information, for example, submit a labeling supplement, add a warning to the labeling, or initiate a new study.

88.    "The manufacturer's annual report also must contain copies of unpublished reports and summaries of published reports of new toxicological findings in animal studies and *in vitro* studies (e.g., mutagenicity) conducted by, or otherwise obtained by, the [manufacturer] concerning the ingredients in the drug product." 21 C.F.R. § 314.81(b)(2)(v).

89.    Defendants ignored these regulations and, disregarding the scientific evidence available to them, did not report to the FDA significant new information affecting the safety or labeling of Zantac.

90.    Defendants never provided the relevant studies to the FDA, nor did they present to the FDA with a proposed disclosure noting the link between ranitidine and NDMA.

91.    In a 1981 study published by GSK, the originator of the ranitidine molecule, the metabolites of ranitidine in urine were studied using liquid chromatography.[21] Many metabolites were listed, though there is no indication that NDMA was looked for. Plaintiffs believe that this was intentional—a gambit by the manufacturer to avoid detecting a carcinogen in their product.

---

[21] Carey et al, *Determination of ranitidine and its metabolites in human urine by reversed-phase ion-pair high-performance liquid chromatography*, 255 J. CHROMATOGRAPHY BIOMED. SCI. & APPL. 161–68 (1981).

92.     By 1987, after numerous studies raised concerns over ranitidine and cancerous nitroso compounds (discussed previously), GSK published a clinical study specifically investigating gastric contents in human patients and N-nitroso compounds.[22] This study specifically indicated that there were no elevated levels of N-nitroso compounds (of which NDMA is one). However, the study was rigged to fail. It used an analytical system called a "nitrogen oxide assay" for the determination of N-nitrosamines, which was developed for analyzing food and is a detection method that indirectly and non-specifically measures N-nitrosamines. Furthermore, in addition to this approach being less accurate, GSK also removed all gastric samples that contained ranitidine out of concern that samples with ranitidine would contain "high concentrations of N-nitroso compounds being recorded." So, without the chemical being present in any sample, any degradation into NDMA could not, by design, be observed. Again, this spurious test was intentional and designed to mask any potential cancer risk.

93.     There are multiple alternatives to Zantac that do not pose the same risk, such as Cimetidine (Tagamet), Famotidine (Pepcid), Omeprazole (Prilosec), Esomeprazole (Nexium), and Lansoprazole (Prevacid).

**Allegations specific to Decedent**

94.     Decedent began using prescription Zantac in or around 2009, including generic ranitidine manufactured and distributed by the Glenmark Defendants and sold to

---

[22] Thomas et al, *Effects of one year's treatment with ranitidine and of truncal vagotomy on gastric contents*, 6 GUT Vol. 28, 726–38 (1987).

25

him by Walgreens drugstores near his home in Orange County, North Carolina. He took a single 150 mg dose daily for approximately nine years until his death in March 2018.

95.     The last ranitidine that Decedent took before his death was manufactured by one or more of the Glenmark Defendants; that prescription was filled just days before his death.

96.     Decedent was diagnosed with stage-four colon cancer in or around November 2017.

97.     Based on prevailing scientific evidence, exposure to Zantac (and the attendant NDMA) can cause colon cancer in humans.

98.     Decedent's colon cancer was caused by repeated ingestion of Zantac.

99.     Had any Defendant warned Decedent that Zantac could lead to exposure to NDMA or, in turn, cancer, Decedent would not have taken Zantac.

100.    Decedent never learned of the link between his cancer and Zantac exposure. Plaintiffs learned of the link only recently, following the recalls and publication of news about the link.

**Allegations in Support of Punitive Damages**

101.    Defendants' conduct as alleged herein was done with reckless disregard for human life, with oppression, and with malice. Defendants were fully aware of the safety risks of Zantac, particularly the carcinogenic potential of Zantac as it transforms into NDMA within the chemical environment of the human body. Nonetheless, Defendants deliberately crafted their label, marketing, and promotion to mislead consumers.

26

102.    This was not done by mere accident or through some justifiable negligence. Rather, Defendants knew that it could turn a profit by convincing consumers that Zantac was harmless to humans, and that full disclosure of the true risks of Zantac would limit the amount of money Defendants would make selling Zantac. Defendants' object was accomplished not only through their misleading label, but through a comprehensive scheme of selective misleading research and testing, false advertising, and deceptive omissions as more fully alleged throughout this pleading. Decedent was denied the right to make an informed decision about whether to purchase and use Zantac, knowing the full risks attendant to that use. Such conduct was done with conscious disregard of Decedent's rights.

103.    Accordingly, Plaintiffs request punitive damages against Defendants for the harms caused to Decedent.

## TOLLING OF STATUTES OF LIMITATIONS AND ESTOPPEL

104.    Within the time period of any applicable statute of limitations, neither Decedent nor Plaintiffs could have discovered through the exercise of reasonable diligence that exposure to Zantac is injurious to human health.

105.    Neither Decedent nor Plaintiffs discovered and did not know of facts that would cause a reasonable person to suspect the risk associated with the use of Zantac, nor would a reasonable and diligent investigation by Decedent or Plaintiffs have discovered that Zantac would cause Decedent's illnesses.

106.    The expiration of any applicable statute of limitations has been equitably tolled by reason of Defendants' misrepresentations and concealment. Through affirmative

27

misrepresentations and omissions, Defendants actively concealed from Plaintiff the true risks associated with use of Zantac.

107. As a result of Defendants' actions, neither Decedent nor Plaintiffs could reasonably have known or learned through reasonable diligence that Plaintiff had been exposed to the risks alleged herein and that those risks were the direct and proximate result of Defendants' acts and omissions.

108. Defendants are estopped from relying on any statute of limitations because of their concealment of the truth regarding the safety of Zantac. Defendants each had a duty to disclose the true character, quality, and nature of Zantac because this was non-public information over which Defendants continue to have control. Defendants knew that this information was not available to Plaintiffs, to Decedent, to Decedent's medical providers, and/or health facilities, yet Defendants failed to disclose the information to the public, including Plaintiffs and Decedent.

109. Defendants had the ability to and did spend enormous amounts of money in furtherance of marketing and promoting a profitable product, notwithstanding the known or reasonably knowable risks. Decedent, Plaintiffs, and medical professionals could not have afforded to and could not have possibly conducted studies to determine the nature, extent, and identity of related health risks and were forced to rely on Defendants' representations.

## CAUSES OF ACTION

### COUNT I:
### DESIGN DEFECT – NEGLIGENCE

110.    Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs as if fully stated herein.

111.    At all relevant times, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Zantac products, which are defective and unreasonably dangerous to consumers, including Plaintiff, thereby placing Zantac products into the stream of commerce. These actions were under the ultimate control and supervision of Defendants. At all relevant times, Defendants designed, researched, developed, manufactured, produced, tested, assembled, labeled, advertised, promoted, marketed, sold, and distributed the Zantac products used by Plaintiff, as described herein.

112.    At all relevant times, Defendants' Zantac products were manufactured, designed, and labeled in an unsafe, defective, and inherently dangerous manner that was dangerous for use by or exposure to the public, including Decedent.

113.    At all relevant times, Defendants' Zantac products reached the intended consumers, handlers, and users or other persons coming into contact with these products within this judicial district and throughout the United States, including Decedent, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendants. At all relevant times, Defendants registered, researched, manufactured, distributed, marketed and sold Zantac products within this judicial district

29

and aimed at a consumer market within this judicial district. Defendants were at all relevant times involved in the retail and promotion of Zantac products marketed and sold in this judicial district.

114. Defendants' Zantac products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants were defective in design and formulation in that, when they left the control of Defendants' manufacturers and/or suppliers, they were unreasonably dangerous and dangerous to an extent beyond that which any ordinary consumer would contemplate and beyond which Decedent contemplated or reasonably could have contemplated.

115. Defendants' Zantac products, as researched, tested, developed, designed, licensed, manufactured, packaged, labeled, distributed, sold, and marketed by Defendants were defective in design and formulation in that, when they left the hands of Defendants' manufacturers and/or suppliers, the foreseeable risks exceeded the alleged benefits associated with their design and formulation.

116. At all relevant times, Defendants knew or had reason to know that Zantac products were defective and were inherently dangerous and unsafe when used in the manner instructed and provided by Defendants.

117. Therefore, at all relevant times, Defendants' Zantac products, as researched, tested, developed, designed, registered, licensed, manufactured, packaged, labeled, distributed, sold and marketed by Defendants were defective in design and formulation, in one or more of the following ways:

a. When placed in the stream of commerce, Defendants' Zantac products were defective in design and formulation, and, consequently, dangerous to an extent beyond that which an ordinary consumer would contemplate;

b. When placed in the stream of commerce, Defendants' Zantac products were unreasonably dangerous in that they were hazardous and posed a grave risk of cancer and other serious illnesses when used in a reasonably anticipated manner;

c. When placed in the stream of commerce, Defendants' Zantac products contained unreasonably dangerous design defects and were not reasonably safe when used in a reasonably anticipated or intended manner;

d. Defendants did not sufficiently test, investigate, or study their Zantac products and, specifically, the ability for Zantac to transform into the carcinogenic compound NDMA within the human body;

e. Exposure to Zantac products presents a risk of harmful side effects that outweigh any potential utility stemming from the use of the drug;

f. Defendants knew or should have known at the time of marketing Zantac products that exposure to Zantac could result in cancer and other severe illnesses and injuries;

g. Defendants did not conduct adequate post-marketing surveillance of their Zantac products; and

h. Defendants could have employed safer alternative designs and formulations.

118.    Plaintiff used and was exposed to Defendants' Zantac products without knowledge of Zantac's dangerous characteristics.

119.    At all times relevant to this litigation, Plaintiff used and/or was exposed to the use of Defendants' Zantac products in an intended or reasonably foreseeable manner without knowledge of Zantac's dangerous characteristics.

31

120.    Decedent could not reasonably have discovered the defects and risks associated with Zantac products before or at the time of exposure due to the Defendants' suppression or obfuscation of scientific information linking Zantac to cancer.

121.    The harm caused by Defendants' Zantac products far outweighed their benefit, rendering Defendants' product dangerous to an extent beyond that which an ordinary consumer would contemplate. Defendants' Zantac products were and are more dangerous than alternative products, and Defendants could have designed Zantac products to make them less dangerous. Indeed, at the time Defendants designed Zantac products, the state of the industry's scientific knowledge was such that a less risky design or formulation was attainable.

122.    At the time Zantac products left Defendants' control, there was a practical, technically feasible and safer alternative design that would have prevented the harm without substantially impairing the reasonably anticipated or intended function of Defendants' Zantac products. For example, the Defendants could have added ascorbic acid (Vitamin C) to each dose of Zantac, which is known to scavenge nitrites and reduce the ability of the body to recombine ranitidine into NDMA.[23]

---

[23] *See, e.g.*, Vermeer, et al., *Effect of ascorbic acid and green tea on endogenous formation of N nitrosodimethylamine and N-nitrosopiperidine in humans*. 428 MUTATION RES.: FUNDAMENTAL & MOLECULAR MECHANISMS OF MUTAGENESIS 353–61 (1999); Garland et al., *Urinary excretion of nitrosodimethylamine and nitrosoproline in humans: Interindividual and intraindividual differences and the effect of administered ascorbic acid and α-tocopherol*, 46 CANCER RES. 5392–5400 (1986).

Case 1:20-cv-00216-UA-JLW    Document 1    Filed 03/06/20    Page 32 of 51

123. Defendants' defective design of Zantac products was willful, wanton, malicious, and conducted with reckless disregard for the health and safety of users of the Zantac products, including Decedent.

124. Therefore, as a result of the unreasonably dangerous condition of their Zantac products, Defendants are strictly liable to Plaintiffs and Decedent.

125. The defects in Defendants' Zantac products were substantial and contributing factors in causing Decedent's illness, injuries, and death, and, but for Defendants' misconduct and omissions, Decedent would not have sustained injuries, illness, and death.

126. Defendants' conduct, as described above, was reckless. Defendants risked the lives of consumers and users of their products, including Decedent, with knowledge of the safety problems associated with Zantac products, and suppressed this knowledge from the general public. Defendants made conscious decisions not to redesign, warn or inform the unsuspecting public. Defendants' reckless conduct warrants an award of punitive damages.

127. As a direct and proximate result of Defendants placing their defective Zantac products into the stream of commerce, and the resulting injuries, Decedent sustained pecuniary loss including general damages in a sum which exceeds this Court's jurisdictional minimum.

128. As a proximate result of Defendants placing their defective Zantac products into the stream of commerce, and the resulting injuries, Plaintiff sustained pecuniary loss

Case 1:20-cv-00216-UA-JLW   Document 1   Filed 03/06/20   Page 33 of 51

including general damages in a sum which exceeds the jurisdictional minimum of this Court.

129. As a proximate result of Defendants placing their defective Zantac products into the stream of commerce, as alleged herein, there was a measurable and significant interval of time during which Decedent suffered great mental anguish and other personal injury and damages.

130. WHEREFORE, Plaintiffs respectfully request this Court to enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

**COUNT II:**
**FAILUURE TO WARN – NEGLIGENCE**

131. Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs as if fully stated herein.

132. At all relevant times, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Zantac products which are defective and unreasonably dangerous to consumers, including Decedent, because they do not contain adequate warnings or instructions concerning the dangerous characteristics of Zantac and NDMA. These actions were under the ultimate control and supervision of Defendants. At all relevant times, Defendants registered, researched, manufactured, distributed, marketed, and sold Zantac and other ranitidine formulations within this judicial district and aimed at a consumer market. Defendants

were at all relevant times involved in the retail and promotion of Zantac products marketed and sold in in this judicial district.

133. Defendants researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and otherwise released into the stream of commerce their Zantac products, and in the course of same, directly advertised or marketed the products to consumers and end users, including Decedent, and therefore had a legal duty to warn of the risks associated with the use of Zantac products.

134. At all relevant times, Defendants had a duty to properly test, develop, design, manufacture, inspect, package, label, market, promote, sell, distribute, maintain, supply, provide proper warnings, and take such steps as necessary to ensure their Zantac products did not cause users and consumers to suffer from unreasonable and dangerous risks. Defendants had a continuing duty to warn Decedent of dangers associated with Zantac. Defendants, as a manufacturer, seller, or distributor of pharmaceutical medication, are held to the knowledge of an expert in the field.

135. At the time of manufacture, Defendants could have provided the warnings or instructions regarding the full and complete risks of Zantac products because they knew or should have known of the unreasonable risks of harm associated with the use of and/or exposure to such products.

136. At all relevant times, Defendants failed and deliberately refused to investigate, study, test, or promote the safety or to minimize the dangers to users and consumers of their product and to those who would foreseeably use or be harmed by Defendants' Zantac products, including Decedent.

137. Even though Defendants knew or should have known that Zantac posed a grave risk of harm, they failed to exercise reasonable care to warn of the dangerous risks associated with use and exposure. The dangerous propensities of their products and the carcinogenic characteristics of NDMA as produced within the human body as a result of ingesting Zantac, as described above, were known to Defendants, or scientifically knowable to Defendants through appropriate research and testing by known methods, at the time they distributed, supplied or sold the product, and were not known to end users and consumers, such as Decedent.

138. Defendants knew or should have known that their products created significant risks of serious bodily harm to consumers, as alleged herein, and Defendants failed to adequately warn consumers, i.e., the reasonably foreseeable users, of the risks of exposure to their products.

139. Defendants have wrongfully concealed information concerning the dangerous nature of Zantac and the potential for ingested Zantac to transform into the carcinogenic NDMA compound, and, further, have made false and misleading statements concerning the safety of Zantac products.

140. At all relevant times, Defendants' Zantac products reached the intended consumers, handlers, and users or other persons coming into contact with these products within this judicial district and throughout the United States, including Decedent, without substantial change in their condition as designed, manufactured, sold, distributed, labeled, and marketed by Defendants.

141. Decedent was exposed to Defendants' Zantac products without knowledge of their dangerous characteristics.

142. At all relevant times, Decedent used and was exposed to the use of Defendants' Zantac products while using them for their intended or reasonably foreseeable purposes, without knowledge of their dangerous characteristics.

143. Decedent could not have reasonably discovered the defects and risks associated with Zantac products prior to or at the time of Decedent consuming Zantac. Decedent relied upon the skill, superior knowledge, and judgment of Defendants to know about and disclose serious health risks associated with using Defendants' products.

144. Defendants knew or should have known that the minimal warnings disseminated with their Zantac products were inadequate, failed to communicate adequate information on the dangers and safe use/exposure, and failed to communicate warnings and instructions that were appropriate and adequate to render the products safe for their ordinary, intended and reasonably foreseeable uses.

145. The information that Defendants did provide or communicate failed to contain relevant warnings, hazards, and precautions that would have enabled consumers such as Decedent to utilize the products safely and with adequate protection. Instead, Defendants disseminated information that was inaccurate, false and misleading, and which failed to communicate accurately or adequately the comparative severity, duration, and extent of the risk of injuries with use of and/or exposure to Zantac; continued to aggressively promote the efficacy of their products, even after they knew or should have known of the unreasonable risks from use or exposure; and concealed, downplayed, or

37

otherwise suppressed, through aggressive marketing and promotion, any information or research about the risks and dangers of ingesting Zantac.

146. This failure to warn is not limited to the information contained on Zantac's labeling. The Defendants were able, in accord with federal law, to comply with relevant state law by disclosing the known risks associated with Zantac through other non-labeling mediums, i.e., promotion, advertisements, public service announcements, and/or public information sources. But Defendants did not disclose these known risks through any medium.

147. Defendants are liable to Decedent's estate for injuries caused by their negligent or willful failure, as described above, to provide adequate warnings or other clinically relevant information and data regarding the appropriate use of their products and the risks associated with the use of Zantac.

148. Had Defendants provided adequate warnings and instructions and properly disclosed and disseminated the risks associated with their Zantac products, Decedent could have avoided the risk of developing injuries and could have obtained or used alternative medication.

149. As a direct and proximate result of Defendants placing defective Zantac products into the stream of commerce, Decedent was injured, died, and sustained pecuniary loss and general damages in a sum exceeding the jurisdictional minimum of this Court.

150. As a proximate result of Defendants placing defective Zantac products into the stream of commerce, as alleged herein, there was a measurable and significant

interval of time during which Decedent suffered great mental anguish and other personal injury and damages.

151. Decedent ultimately died as a proximate result of Defendants placing defective Zantac products into the stream of commerce, as alleged herein.

152. WHEREFORE, Plaintiffs respectfully request this Court to enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

## COUNT III:
## NEGLIGENCE

153. Plaintiffs incorporate by reference each allegation set forth in preceding paragraphs as if fully stated herein.

154. Defendants, directly or indirectly, caused Zantac products to be sold, distributed, packaged, labeled, marketed, promoted, and/or used by Decedent. At all relevant times, Defendants registered, researched, manufactured, distributed, marketed and sold Zantac within this judicial district and aimed at a consumer market within this district.

155. At all relevant times, Defendants had a duty to exercise reasonable care in the design, research, manufacture, marketing, advertisement, supply, promotion, packaging, sale, and distribution of Zantac products, including the duty to take all reasonable steps necessary to manufacture, promote, and/or sell a product that was not unreasonably dangerous to consumers and users of the product.

156.    At all relevant times, Defendants had a duty to exercise reasonable care in the marketing, advertisement, and sale of the Zantac products. Defendants' duty of care owed to consumers and the general public included providing accurate, true, and correct information concerning the risks of using Zantac and appropriate, complete, and accurate warnings concerning the potential adverse effects of Zantac and, in particular, its ability to transform into the carcinogenic compound NDMA.

157.    At all relevant times, Defendants knew or, in the exercise of reasonable care, should have known of the hazards and dangers of Zantac and, specifically, the carcinogenic properties of NDMA when Zantac is ingested.

158.    Accordingly, at all relevant times, Defendants knew or, in the exercise of reasonable care, should have known that use of Zantac products could cause or be associated with Decedent's illness and death, and thus, create a dangerous and unreasonable risk of illness and death to the users of these products, including Decedent.

159.    Defendants also knew or, in the exercise of reasonable care, should have known that users and consumers of Zantac were unaware of the risks and the magnitude of the risks associated with use of Zantac.

160.    As such, Defendants breached their duty of reasonable care and failed to exercise ordinary care in the design, research, development, manufacture, testing, marketing, supply, promotion, advertisement, packaging, sale, and distribution of Zantac products, in that Defendants manufactured and produced defective Zantac which carries the potential to transform into the carcinogenic compound NDMA; knew or had reason to know of the defects inherent in their products; knew or had reason to know that a user's

Case 1:20-cv-00216-UA-JLW   Document 1   Filed 03/06/20   Page 40 of 51

or consumer's use of the products created a significant risk of harm and unreasonably dangerous side effects; and failed to prevent or adequately warn of these risks and injuries. Indeed, Defendants deliberately refused to test Zantac products because they knew that the chemical posed serious health risks to humans.

161.   Defendants were negligent in their promotion of Zantac, outside of the labeling context, by failing to disclose material risk information as part of their promotion and marketing of Zantac, including the internet, television, print advertisements, etc. Nothing prevented Defendants from being honest in their promotional activities, and, in fact, Defendants had a duty to disclose the truth about the risks associated with Zantac in their promotional efforts, outside of the context of labeling.

162.   Despite their ability and means to investigate, study, and test the products and to provide adequate warnings, Defendants failed to do so. Indeed, Defendants wrongfully concealed information and further made false and/or misleading statements concerning the safety and use of Zantac.

163.   Defendants' negligence included:

    a. Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Zantac products without thorough and adequate pre- and post-market testing;

    b. Manufacturing, producing, promoting, formulating, creating, developing, designing, selling, and/or distributing Zantac while negligently and/or intentionally concealing and failing to disclose the results of trials, tests, and studies of Zantac and the carcinogenic potential of NDMA as created in the human body as a result of ingesting Zantac, and, consequently, the risk of serious harm associated with human use of Zantac;

c. Failing to undertake sufficient studies and conduct necessary tests to determine whether or not Zantac products were safe for their intended consumer use;

d. Failing to use reasonable and prudent care in the design, research, manufacture, and development of Zantac products so as to avoid the risk of serious harm associated with the prevalent use of Zantac products;

e. Failing to design and manufacture Zantac products so as to ensure they were at least as safe and effective as other medications on the market intended to treat the same symptoms;

f. Failing to provide adequate instructions, guidelines, and safety precautions to those persons Defendants could reasonably foresee would use Zantac products;

g. Failing to disclose to Decedent, users, consumers, and the general public that use of Zantac presented severe risks of cancer and other grave illnesses and death;

h. Failing to warn Decedent, consumers, and the general public that the product's risk of harm was unreasonable and that there were safer and effective alternative medications available to Decedent and other consumers;

i. Systematically suppressing or downplaying contrary evidence about the risks, incidence, and prevalence of the side effects of Zantac products;

j. Representing that their Zantac products were safe for their intended use when, in fact, Defendants knew or should have known the products were not safe for their intended purpose;

k. Declining to make or propose any changes to Zantac products' labeling or other promotional materials that would alert consumers and the general public of the risks of Zantac;

l. Advertising, marketing, and recommending the use of the Zantac products, while concealing and failing to disclose or warn of the dangers known (by Defendants) to be associated with or caused by the use of or exposure to Zantac;

m. Continuing to disseminate information to their consumers, which indicate or imply that Defendants' Zantac products are not unsafe for regular consumer use; and

42

n. Continuing the manufacture and sale of their products with the knowledge that the products were unreasonably unsafe and dangerous.

164. Defendants knew and/or should have known that it was foreseeable consumers such as Decedent would suffer injuries and/or death as a result of Defendants' failure to exercise ordinary care in the manufacturing, marketing, labeling, distribution, and sale of Zantac.

165. Decedent did not know the nature and extent of the injuries that could result from the intended use of and/or exposure to Zantac.

166. Defendants' negligence was the proximate cause of Decedent's injuries, illness, and death, *i.e.*, absent Defendants' negligence, Decedent would not have developed cancer.

167. Defendants' conduct, as described above, was reckless. Defendants regularly risked the lives of consumers and users of their products, including Decedent, with full knowledge of the dangers of their products. Defendants have made conscious decisions not to redesign, relabel, warn, or inform the unsuspecting public, including Decedent. Defendants' reckless conduct therefore warrants an award of punitive damages.

168. As a direct and proximate result of Defendants placing defective Zantac products into the stream of commerce, Decedent was injured, sustained pecuniary loss, death, and general damages in a sum exceeding the jurisdictional minimum of this Court.

169. As a proximate result of Defendants placing defective Zantac products into the stream of commerce, as alleged herein, there was a measurable and significant

interval of time during which Decedent suffered great mental anguish and other personal injury and damages.

170. WHEREFORE, Plaintiffs respectfully request this Court to enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

**COUNT IV:**
**BREACH OF EXPRESS WARRANTY**

171. Plaintiffs incorporate by reference each allegation set forth in the preceding paragraphs as if fully stated herein.

172. At all relevant times, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Zantac products, which are defective and unreasonably dangerous to consumers, including Decedent, thereby placing Zantac products into the stream of commerce. These actions were under the ultimate control and supervision of Defendants.

173. Defendants had a duty to exercise reasonable care in the research, development, design, testing, packaging, manufacture, inspection, labeling, distributing, marketing, promotion, sale, and release of Zantac products, including a duty to:

    a. ensure that their products did not cause the user unreasonably dangerous side effects;

    b. warn of dangerous and potentially fatal side effects; and

    c. disclose adverse material facts, such as the true risks associated with the use of and exposure to Zantac, when making representations to consumers and the general public, including Decedent.

174.  As alleged throughout this Complaint, Defendants' ability to properly disclose those risks associated with Zantac is not limited to representations made on the labeling.

175.  At all relevant times, Defendants expressly represented and warranted to the purchasers of their products, by and through statements made by Defendants in labels, publications, package inserts, and other written materials intended for consumers and the general public, that Zantac products were safe to human health and the environment, effective, fit, and proper for their intended use. Defendants advertised, labeled, marketed, and promoted Zantac products, representing the quality to consumers and the public in such a way as to induce their purchase or use, thereby making an express warranty that Zantac products would conform to the representations.

176.  These express representations include incomplete warnings and instructions that purport but fail to include the complete array of risks associated with use of and/or exposure to Zantac. Defendants knew and/or should have known that the risks expressly included in Zantac warnings and labels did not and do not accurately or adequately set forth the risks of developing the serious injuries complained of herein. Nevertheless, Defendants expressly represented that Zantac products were safe and effective, that they were safe and effective for use by individuals such as Decedent, and/or that they were safe and effective as consumer medication.

177.  The representations about Zantac, as set forth herein, contained or constituted affirmations of fact or promises made by the seller to the buyer, which related

to the goods and became part of the basis of the bargain, creating an express warranty that the goods would conform to the representations.

178.    Defendants placed Zantac products into the stream of commerce for sale and recommended their use to Decedent, other consumers, and the public without adequately warning of the true risks of developing the injuries associated with the use of Zantac.

179.    Defendants breached these warranties because, among other things, Zantac products were defective, dangerous, and unfit for use, did not contain labels representing the true and adequate nature of the risks associated with their use, and were not merchantable or safe for their intended, ordinary, and foreseeable use and purpose. Specifically, Defendants breached the warranties in at least the following ways:

a.    Defendants represented through their labeling, advertising, and marketing materials that Zantac products were safe, and intentionally withheld and concealed information about the risks of serious injury associated with use of Zantac and by expressly limiting the risks associated with use within its warnings and labels; and

b.    Defendants represented that Zantac products were safe for use and intentionally concealed information that demonstrated that Zantac, by transforming into NDMA upon human ingestion, had carcinogenic properties, and that Zantac products, therefore, were not safer than alternatives available on the market.

180.    Decedent detrimentally relied on Defendants' express warranties and representations concerning the safety and/or risk profile of Zantac in deciding to purchase the product. Decedent reasonably relied upon Defendants to disclose known defects, risks, dangers, and side effects of Zantac. Decedent would not have purchased or used

Zantac had Defendants properly disclosed the risks associated with the product, either through advertising, labeling, or any other form of disclosure.

181.   Defendants had sole access to material facts concerning the nature of the risks associated with their Zantac products, as expressly stated within their warnings and labels, and knew that consumers and users such as Decedent could not have reasonably discovered that the risks expressly included in Zantac warnings and labels were inadequate and inaccurate.

182.   Decedent had no knowledge of the falsity or incompleteness of Defendants' statements and representations concerning Zantac.

183.   Decedent used and was exposed to Zantac as researched, developed, designed, tested, manufactured, inspected, labeled, distributed, packaged, marketed, promoted, sold, or otherwise released into the stream of commerce by Defendants.

184.   Had the warnings, labels, advertisements, or promotional material for Zantac products accurately and adequately set forth the true risks associated with the use of such products, including Decedent's injuries, rather than expressly excluding such information and warranting that the products were safe for their intended use, Decedent could have avoided the injuries complained of herein.

185.   As a direct and proximate result of Defendants' breach of express warranty, Decedent sustained pecuniary loss and general damages in a sum exceeding the jurisdictional minimum of this Court.

186.     As a proximate result of Defendants' breach of express warranty, as alleged herein, there was a measurable and significant interval of time during which Decedent suffered great mental anguish and other personal injury and damages, including death.

187.     As a proximate result of Defendants' breach of express warranty, as alleged herein, Decedent sustained a loss of income and/or loss of earning capacity.

188.     WHEREFORE, Plaintiffs respectfully request this Court to enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees, and all such other and further relief as this Court deems just and proper.

### COUNT V:
### BREACH OF IMPLIED WARRANTY

189.     Plaintiffs incorporate by reference every allegation set forth in preceding paragraphs as if fully stated herein.

190.     At all relevant times, Defendants engaged in the business of testing, developing, designing, manufacturing, marketing, selling, distributing, and promoting Zantac products, which were and are defective and unreasonably dangerous to consumers, including Decedent, thereby placing Zantac products into the stream of commerce

191.     Before the time Decedent used Zantac products, Defendants impliedly warranted to their consumers, including Decedent, that Zantac products were of merchantable quality and safe and fit for the use for which they were intended; specifically, as consumer medication.

48

192. But Defendants failed to disclose that Zantac has dangerous propensities when used as intended and that use of Zantac products carries an increased risk of developing severe injuries, including Decedent's injuries.

193. Decedent was an intended beneficiary of the implied warranties made by Defendants to purchasers of their Zantac products.

194. The Zantac products were expected to reach and did in fact reach consumers and users, including Plaintiff, without substantial change in the condition in which they were manufactured and sold by Defendants.

195. At all relevant times, Defendants were aware that consumers and users of their products, including Decedent, would use Zantac products as marketed by Defendants, which is to say that Decedent was a foreseeable user of Zantac.

196. Defendants intended that Zantac products be used in the manner in which Decedent in fact used them and which Defendants impliedly warranted to be of merchantable quality, safe, and fit for this use, even though Zantac was not adequately tested or researched.

197. In reliance upon Defendants' implied warranty, Decedent used Zantac as instructed and labeled and in the foreseeable manner intended, recommended, promoted, and marketed by Defendants.

198. Decedent could not have reasonably discovered or known of the risks of serious injury associated with Zantac.

199. Defendants breached their implied warranty to Decedent in that Zantac products were not of merchantable quality, safe, or fit for their intended use, or

49

adequately tested. Zantac has dangerous propensities when used as intended and can cause serious injuries, including those injuries complained of herein.

200. The harm caused by Defendants' Zantac products far outweighed their benefit, rendering the products more dangerous than an ordinary consumer or user would expect and more dangerous than alternative products.

201. As a direct and proximate result of Defendants' breach of implied warranty, Decedent sustained death, pecuniary loss, and general damages in a sum exceeding the jurisdictional minimum of this Court

202. As a proximate result of the Defendants' breach of implied warranty, as alleged herein, there was a measurable and significant interval of time during which Decedent suffered great mental anguish and other personal injury and damages.

203. As a proximate result of Defendants' breach of implied warranty, as alleged herein, Decedent sustained a loss of income and/or loss of earning capacity.

204. WHEREFORE, Plaintiffs respectfully request this Court to enter judgment in Plaintiffs' favor for compensatory and punitive damages, together with interest, costs herein incurred, attorneys' fees and all such other and further relief as this Court deems just and proper.

**WHEREFORE**, Plaintiffs pray the Court that they have:

1. A trial by jury on all issues so triable;

2. Judgment against the Defendants, jointly and severally, for compensatory damages in excess of Twenty-Five Thousand Dollars ($75,000.00);

3. Punitive damages;

4.     Pre-judgment and post-judgment interest as provided by law;

5.     The costs of this action;

6.     Plaintiffs' reasonable attorneys' fees; and

7.     Such other and further relief as the Court may deem just and proper.


Respectfully submitted, this the 6th day of March 2020.


                              **LAW OFFICES OF JAMES SCOTT FARRIN**
                              *Attorneys for Plaintiffs*


                              By: */s/ Chris Bagley*
                              Gary W. Jackson (NC State Bar No. 13976)
                              Christopher R. Bagley (NC State Bar No. 50567)
                              280 South Mangum Street, Suite 400
                              Durham, North Carolina 27701
                              Telephone:  (919) 688-4991
                              Facsimile:  (919) 688-4468
                              cbagley@farrin.com